IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Steven Jenkins, *et al.*      *
       Plaintiffs      *
                 *
   v.      *      CIVIL NO. SKG-10-125

Baltimore City Fire
Department, *et al.*      *
       Defendants.      *

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM OPINION AND ORDER

Plaintiffs, five current or former African American Baltimore City Fire Department employees, filed a Title VII employment suit alleging race discrimination against the Baltimore City Fire Department ("BCFD") and the Mayor and City Council of Baltimore ("City").  Presently before the Court is defendants' motion for summary judgment.  (ECF No. 47).  For the reasons set forth below, the Court GRANTS defendants' motion.

## I.   Procedural History

On August 23, 2007, plaintiffs filed charges with the EEOC alleging that the BCFD violated Title VII of the Civil Rights Act of 1964 by denying them promotion based on their African American race.  (ECF No. 47-2, 2-6).  On February 17, 2009, the EEOC issued a determination that, based on defendants' failure to respond to the EEOC's requests for a response to the charges,

1

there was reasonable cause to believe that defendants violated
Title VII.  (ECF No. 47-28, 2-11).  The EEOC forwarded
plaintiffs' charges to the Department of Justice ("DOJ"), which
declined to file suit on behalf of plaintiffs, and, on October
19, 2009, issued plaintiffs notices of right to sue.  (ECF No.
47-3, 2-6).

On January 19, 2010, plaintiffs filed a complaint in this
Court alleging that defendants racially discriminated against
them in violation of Title VII.  (ECF No. 1).  On August 13,
2011, defendants filed a motion for summary judgment.  Briefing
was complete as of December 1, 2011.  On January 30, 2012, the
Court held a hearing. (ECF No. 61).

## II.  Facts

The Court sets forth the facts presented by the parties in
the light most favorable to plaintiffs, the non-moving party.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986).  The facts are, however, largely undisputed.  What
is disputed is the intention of the defendants in the actions
they took and what, if any, inferences of discriminatory animus
can be reasonably drawn from the facts.

In June 2007, plaintiffs Steven Jenkins, Michael Johnson, and
Theresa Jones were firefighters with BCFD, and plaintiffs
Jarrett Stafford and Rodney Williams were lieutenants with BCFD.
(ECF No. 1, ¶10(a)(i)-(ii)). All five plaintiffs sought

2

promotion to a higher rank.  Specifically, the firefighters sought promotion to lieutenant positions, and the lieutenants sought promotion to captain positions.  (Id.).

In order to obtain promotion to captain and lieutenant positions, BCFD employees must take a written exam.  Plaintiffs did so on June 2, 2007.  Before describing the events associated with plaintiffs' participation in the 2007 exams, however, a brief description of the promotional exam process is necessary.

BCFD's promotional exams are created and administered by the Baltimore City Department of Human Resources ("DHR") approximately every two years.  (ECF No. 47-6, 3).  Those BCFD employees seeking lieutenant positions must take the lieutenant exam; while those seeking captain positions must take the captain exam. The lieutenant and captain exams are administered together, and questions on the two exams are identical, except that the captain exam has about 15 additional questions, which are of the same subject matter as all the other questions (i.e., the additional questions are not geared towards captain-specific duties).  (ECF No. 47-8, 5-6).  Thus, applicants for the two tests use the same study materials.  (ECF No. 47-7, 2).

After the tests are administered, they are scored by a DHR employee. (Id.)  Those who took the lieutenant test are placed in rank order on a lieutenant promotion list, and those who took the captain exam are placed in rank order on a captain promotion

list.  The lists remain active until the next exams are administered (typically two years later) and new lists are created.  When one list expires, a new list becomes effective immediately.  (ECF No. 47-6, 3).  Pursuant to Memoranda of Understanding between BCFD and local firefighter unions, BCFD must promote based on the ranking of the *active* list.  (See e.g., ECF No. 56, Ex. I & F ("[BCFD will not] deviate from the present policy of selection of the first candidate on a list, through all grades up to and including Battalion Chief")).  The Chief of BCFD makes the promotions by issuing general orders.  (ECF No. 47-28; ECF No. 47-29).

Typically, promotions are made from the active list to fill vacancies that arise during the lifetime of the active list.  Those vacancies are filled by the promoted person *prior* to the expiration of the active list.

However, under the Manual of Procedure ("MOP") Policy in place at the time relevant to this suit, MOP 355, the chief could, under certain circumstances, fill a current vacancy with someone promoted off of an *expired* list.  (ECF No. 47-29, 2).  Under the MOP, that type of promotion could occur where, *at some point prior to the expiration* of a list, the BCFD projected that a vacancy would arise within 90 days after the expiration of that list (*i.e.*, within the first 90 days of the new, active list).  (Id.).  The chief could then essentially reserve a spot for

4

someone on the soon-to-expire list, to be filled when the vacancy would actually arise (at some point after the new list's activation). (Id.). That type of promotion is called either a "projected promotion" or a "conditional promotion." (ECF No. 47-6, 6).

Notably, although a conditional promotion could take effect *after* the expiration of the list, the MOP required projections to be made and promotions to be announced *prior* to the list's expiration. (ECF No. 56, Ex. 28; ECF No. 56, Ex. J, 35, 67).

The Court turns now to the events associated with plaintiffs' participation in the 2007 exam. Plaintiffs took their respective promotional exams on June 2, 2007 at the Baltimore Convention Center. (ECF No. 56, Ex. I, 62). Jenkins, Johnson, and Jones took the lieutenant exam; Williams and Stafford took the captain exam. (ECF No. 1, ¶ 10). Shortly after the exam, rumors began circulating that certain members of the BCFD made comments suggesting that they had aced the exam. (ECF No. 56, Ex. I, 69).

On July 2, 2007, the exam results were certified by Gladys Gaskins, Director of DHR, and lists of the rankings were released to BCFD. (Id. at 55, 90). At that point, the prior captain and lieutenant lists—from the 2005 exam—expired. (ECF No. 47-6, 3-4). All plaintiffs did exceptionally well on the 2007 exams. (ECF No. 47-9, 2, 7). Jenkins, Johnson, and Jones

were ranked first, second, and third (respectively) on the lieutenant exam. (Id. at 2).  Jenkins scored a 98.12, Johnson scored a 97.25, and Jones scored a 90.85.  (Id.).  The next few best lieutenant exam scores were as follows: 89.05, 87.50, 86.12, 85.43, and 85.06. (Id.).  Williams and Stafford scored first and second, respectively, on the captain exam.  (Id. at 7).  Williams scored a 95.68 and Stafford scored a 95.14.  (Id.).  The next few highest captain scores were: 89.01, 87.71, 82.82, 81.92, and 81.05. (Id.).[1]

Because plaintiffs all appeared to be connected through personal links of friendship or family, rumors to the effect that plaintiffs cheated on the exam began circulating among the

---

[1] Evidence as to plaintiffs' scores on prior exams is incomplete. A statistical analysis contained within the OIG report (discussed in detail infra) simply notes that Stafford, Williams, Jenkins and Johnson's 2007 scores were "extremely high given their average scores on all previous tests taken." (ECF No. 56, Ex. A; Id., Ex. B, Def. 3322, 3324).  The statistical analysis also stated that an email sent from a DHR test developer on July 16, 2007 (it is not clear to whom) indicates that Stafford and Williams' final scores on the 2001 exam were 78% and 79%, respectively.  (ECF No. 65-1, 2).  That same email states that Jones failed the exam in 2003 and received a final score of 75.50% in 2001.  (Id.).  Plaintiffs submitted evidence showing that Williams received a final score of 94.50% in 1997. (ECF No. 56, Ex. H).  Accordingly, there is undisputed evidence that plaintiffs' prior scores were lower, some significantly lower than on prior exams.  In any event, defendants' actions must be viewed in light of the information they knew and acted upon, not the actual facts, including the precise, actual prior scores of all the plaintiffs.  The record demonstrates that there were reports of and indeed knowledge of past lower scores by the complaining members of BCFD, the unions and the City at the time the investigation was ordered.

firefighters.  (ECF No. 47-5, 4; 47-10, 2-3).   Williams and

Jenkins were friends; Williams and Stafford were close friends;

and Stafford and Johnson were also friends.  (ECF No. 47-8, 3-4;

ECF No. 47-5, 6).  Those four plaintiffs studied together for

the 2007 exams.  (ECF No. 47-5, 6; ECF No. 47-7, 3).  Williams

and Jones, the fifth plaintiff, also studied together.  (ECF No.

47-12, 3; ECF No. 47-8, 5).  Williams is the father of one of

Jones' children, and the two have remained friendly.  (ECF No.

47-8, 5; ECF No. 47-12, 3).  Further, BCFD firefighters began

circulating rumors that plaintiffs had personal ties to DHR

employees who had access to testing information.  (ECF No. 47-5,

4).  For example, rumor had it that either Stafford or

Stafford's father dated DHR Personnel Administrator Juanita

Cobb, who provided Stafford with answers to the exam, which

Stafford then distributed. (ECF No. 47-5, 3-4).

On July 2 and July 3, 2007, members of Local 964, one of two

local firefighters' unions, began electronically posting

accusations on a forum located on Local 964's website. (ECF No.

47-10).  Shawn Little (an emergency vehicle driver) posted a

comment, dated July 2, 2007, stating in pertinent part:

> Congratulations to all who placed well on
> the recent promotional examinations.  For
> those that studied, Great Job.
> Unfortunately, the FAIR testing process has
> been tarnished once again.  . . . How
> unfortunate it is that once again there are
> cheaters among us.  YOU KNOW WHO YOU ARE.

> #1, 2 & 3 Lieutenant and #1 & 2 Captain.   .
> . . PS.  Next time you get together to go
> over the test answers prior to the test you
> may want to get a few more wrong so it's not
> so obvious.  I think when I am done posting
> this I will call one of my relatives and
> have them apply for Human Resources so I can
> get the test.

(Id.).  The next day, Bill Webster (a firefighter) posted the

following comment, dated July 3, 2007:

> We all knew these guys cheated before and
> now the low lifes are at it again.  These
> two idiots need to make captain because they
> couldn't even spell lieutenant.  How about
> we all pitch in and hire a good private
> investigator to uncover the dirt on these
> two turds.

(Id.).

On July 11, 2007, the cheating allegations were published in

the Baltimore Sun.  (ECF No. 47-13).  The article stated as

follows:

> Two Baltimore fire unions want an
> investigation into allegations of cheating
> on the city's recent captain and lieutenant
> promotion exams after they said two members
> had unusually high marks.  Stephen G.
> Fugate, the head of the fire officers'
> union, said there is no proof of cheating
> but noted that lieutenants who scored in the
> top two slots of the captain's test are
> related[2] and had results that were
> significantly higher than the other test-
> takers. 'That kind of gap in scores is
> unprecedented,' he said.  Fugate also said
> that the firefighter who scored at the top

---

[2] Mr. Fugate's remark that Stafford and Williams are related
appears incorrect; the record indicates that they were merely
friends.  (ECF No. 47-5, 6; ECF No. 47-8, 4).

of the lieutenant's test had taken the exam
previously and failed.   Fugate said that
several of his members believe the city's
human resources department—which administers
the exam on behalf of the department—leaked
the questions.   . . . Richard G.
Schluderberg, president of [Local 734], said
yesterday he also wants an investigation to
'protect the integrity of the test.'

(Id.).

Some of the plaintiffs testified that the two local unions
supported the investigation of the cheating allegations and that
Fugate, president of the Local 694, made statements questioning
the plaintiffs' ability to achieve the higher scores.   (See ECF
No. 47-5, 4 (Stafford testified that he saw Fugate on the news
stating that he "was going to be investigating to find out what
was going on"); ECF No. 47-8, 13 (Williams testified that Fugate
commented to the press that plaintiffs were not "clever enough
to score that high"); ECF No. 47-12, 7 (Jones testified that
"the unions . . . went out there and they supported the
allegations"); ECF No. 47-21, 3 (Johnson testified that Fugate
commented on TV that some of the plaintiffs were related and
were not known to be avid studiers)).

On July 11, 2007, the same day that the Sun Article was
published, Mr. Stafford saw two documents posted on the
firehouse kitchen bulletin board.   (ECF No. 47-5, 8; ECF No. 47-
11).   The documents were print-outs of the two forum comments
that Mr. Little and Mr. Webster posted on Local 964's website.

(ECF No. 47-10).  Mr. Stafford immediately took photographs of
the documents and filed a special report on the incident with
the Chief of BCFD at that time, William Goodwin. (ECF No. 47-5,
8; ECF No. 47-11).

The next day, July 12, 2007, the Baltimore Sun released
another article on the incident, announcing that Mayor Dixon
asked the City's Office of the Inspector General ("OIG") to
investigate the allegations of cheating.  (ECF No. 47-15, 2; ECF
No. 47-4, 7, ¶¶ 8-9; ECF No. 56, 9).  Mayor Dixon selected an
independent investigator to do the job, rather than DHR, because
DHR is the entity that administers the exam. (ECF No. 47-15).

Also on July 12, 2007, Mr. Fugate sent an email to Labor
Commissioner Deborah Moore-Carter.  (ECF No. 47-14).  He noted
the "SIGNIFICANT gap between the top two finishers on the
Captain's list and everyone else" and the "similar though not as
pronounced issue on the lieutenant's list." (Id.).  He stated
that the "five members involved are all somehow related," and
that "the top scorer on the lieutenant's list has failed the
test in recent attempts." (Id.).  Further, he stated that "[b]y
all accounts, none of the five involved were known to be
studying to any significant degree and the two atop the
Captains' list were thought to have cheated when they both
placed side-by-side on the lieutenants list from which they were
promoted." (Id.).  He concluded by stating "I know most of the

10

members involved, and it is absolutely clear to me that something is truly amiss." (Id.).

The OIG's investigation began in July 2007, and the report of the investigation was not published until sometime in late November 2007. (ECF No. 56, Ex. I, 85, 89).  The details and results of the investigation are discussed further below.

On July 2, 2007, the 2005 list expired and the 2007 list became effective.  However, no promotions were made off the 2007 list.  Instead, after the Mayor's July 12 announcement of an independent investigation into the cheating allegations, between July 20, 2007 and August 24, 2007,[3] Chief Goodwin issued a series of general orders promoting persons off the 2005 list.[4] (ECF No.

---

[3] Chief Goodwin made other promotions subsequent to that time, but those promotions are irrelevant to this analysis because they were promotions of individuals in Emergency Medical Services, or of firefighters not competing for promotions of lieutenant or captain in fire suppression.  (See ECF No. 47-1, 11).

[4] It is not clear what authority Goodwin had to promote off the 2005 list.  As discussed infra, there appears to be a dispute as to whether Goodwin had the proper authority to do so (i.e., whether promotions off the 2005 list were in accordance with operating procedures).  Notably, no evidence was presented of any challenge to these promotions from the 2005 list during the pendency of the investigation.  Plaintiffs argue that Goodwin violated collective bargaining agreements pursuant to which persons can only be promoted in rank order off certified lists. (ECF No. 56, 14, 20).  Although it is not clear, defendants appear to argue that the promotions could have been in accordance with the manual of operating procedure ("MOP") at that time, which permitted retroactive promotions in some cases. (ECF No. 47-1, 11; ECF No. 56, Ex. 19 (characterizing defendant's argument as such)).  Plaintiffs appear to counter that exceptions under the MOP were not applicable in this case.

56, Ex. G, 3-7; ECF No. 47-6, 6).   Plaintiffs acknowledged that
promotions from the 2007 list were deferred while investigations
and disciplinary actions were pursued against plaintiffs.   (See
ECF No. 56, 19).   During that time, Chief Goodwin promoted to
captain positions (for which plaintiffs Stafford and Williams
were competing) the two persons ranking directly under
Christopher Hutson, who was the last person promoted to captain
off of the 2005 captain list before it expired. (See ECF No. 64,
3; Id. Ex. A, 19).   Those two persons were: Harry Melrose
(white, promoted July 20, 2007), and Scott Czawlytko (white,
promoted July 20, 2007).[5] (ECF No. 64, Ex. A. 19; ECF No. 56, Ex.
G, 3, 4).

---

(ECF No. 56, 19-20), and, although it is not clear, the evidence
suggests that that may be true with respect to some of the
promotions made.   (See ECF No. 56, Ex. J).   Notably, the record
contains no deposition of Goodwin.   In any event, and as
explained in detail infra, any dispute as to this issue is not
material to the resolution of the summary judgment motion.

[5] On August 24, 2007, Chief Goodwin also promoted James McCauley
(black) off the 2005 list.   (ECF No. 66, Ex. A, 19; ECF No. 56,
Ex. G, 3-4, 7).   However, it is not clear whether the captain
position that McCauley filled was one for which Stafford and
Williams were competing.   The Court asked the parties to
stipulate to a list of persons from the 2005 exam who filled
positions to which plaintiffs could have been promoted absent
allegations of cheating.   (ECF No. 62, 1-2; ECF No. 68, 1).   The
parties never provided such a list.   Instead, as far as captain
positions, plaintiffs simply stated that Czawlytko and Melrose
filled positions that Stafford and Williams should have filled,
without ever mentioning McCauley. (ECF No. 64, 4).   Because
defendants never responded to plaintiffs' answer by identifying
McCauley's promotion as relevant, the Court assumes that the
captain position McCauley filled was not one for which Stafford

Also during that time, Chief Goodwin promoted to lieutenant positions (for which plaintiffs Jenkins, Johnson, and Jones were competing) three persons ranking under Mitchell Gilbert, who was the last person promoted to lieutenant off the 2005 lieutenant list before it expired. (See ECF No. 64, 4; Id., Ex. A, 11). Those three persons were: Hennreitta Lewis-Ott (black, promoted July 20, 2007), Matthew Dubois (white, promoted July 20, 2007), and Heather Cate (white, promoted July 20, 2007).[6] (ECF No. 66, Ex. A, 11; ECF No. 56, Ex. G, 3).

---

and Williams were competing.  Accordingly, and in viewing the evidence in a light most favorable to plaintiffs, the Court will not consider McCauley's promotion in analyzing whether plaintiffs established a *prima facie* case of disparate promotion (below).  However, McCauley's promotion is relevant to the Court's analysis of plaintiffs' disparate promotion pretext argument (below), and the Court will consider it in that context.

[6] Chief Goodwin also promoted to lieutenant positions the following persons off of the 2005 list: Timothy Rice (black, promoted on July 20, 2007), Andrew Franz (white, promoted August 24, 2007), and Ellery Queen (black, promoted July 20, 2007). (ECF No. 64, Ex. A, 11; ECF No. 56, Ex. G, 4, 5, 7).  On the 2005 exam, Rice ranked directly below Gilbert, Franz ranked directly below Lewis-Ott, and Queen ranked directly above Gilbert. (ECF No. 64, Ex. A, 11).  Again, the parties never stipulated to a list of persons from the 2005 list who filled positions for which plaintiffs were competing. Instead, as far as lieutenant promotions, plaintiffs merely stated that Dubois, Lewis-Ott, and Cate filled positions that should have gone to Jenkins, Johnson and Jones.  (ECF No. 64, 4).  Defendant never responded by pointing to Goodwin's promotions of Rice (black), Franz (white) or Queen (black), so the Court assumes that the latter persons filled positions that were not ones for which Jenkins, Jonson and Jones were competing.  Accordingly, the Court will not consider those promotions in its disparate promotion *prima facie* analysis. However, the Court will consider

Notably, the date range between July 20, 2007 and August 24, 2007 is within the 90-day "conditional promotions" period. However, the record is not sufficient to definitively determine whether these promotions from the 2005 lists were in complete compliance with the operative MOP.  Some of the promotions—specifically, the promotions of Melrose (white), Lewis-Ott (black), Dubois (white), and Cate (white)—were explicitly marked as "conditional promotions" "as per MOP 355." (ECF No. 56, Ex. G, 3).  Again, MOP 355 required projections to be made and promotions to be announced *prior* to the list's expiration.  (ECF No. 56, Ex. 28; ECF No. 56, Ex. J, 35, 67).  Thus, those four vacancies appear to have been projected—and the conditional promotions announced—prior to expiration of the 2005 list. Plaintiffs offer no evidence to the contrary.  But all other promotions made during the relevant time were not marked as "conditional."  (ECF No. 56, Ex. G, 4-8).  Thus, it is possible that those projections were not made and the promotions not announced, prior to July 2, 2007.  (ECF No. 56, 19-20).  In other words, those promotions may not have been made in strict accordance with the MOP. (Id.).[7]

---

promotion of the latter persons in its disparate promotion pretext analysis.

[7] In support of their argument that at least some of the promotions were not made in accordance with the MOP, plaintiffs cite a portion of the deposition of Assistant Chief Donald

As noted above, the report of the OIG investigation was published sometime in November 2007.  The OIG report consisted primarily of a statistical analysis of the exam results conducted by Dr. John Bruno and interviews with plaintiffs and others somehow involved in the incident. (ECF No. 56, Ex. A).[8]

Dr. Bruno's statistical analysis was performed using examinee numbers, rather than names.  (Id.). In his reports on the fire captain and fire lieutenants' qualification test irregularities, Dr. Bruno stated that "cheating on a test can never be proven by probabilistic or statistical means," and that "[p]roof of cheating can only come from actually catching an examinee in the act. . .  All that statistical and/or probabilistic methods can provide is an indication of the likelihood that cheating has occurred."  (Id.).

---

Heinbuch (ECF No. 56, 20).  When asked about the promotion of Timothy Rice (black) off the 2005 list to lieutenant (See ECF No. 56, G, Def. 1888), Heinbuch speculated that the promotion may have been the result of a projected vacancy that was either skipped or not anticipated. (ECF No. 56, J). Plaintiffs' counsel then stated "that's not exactly the way [the MOP] operates; is that correct?" (Id.).  In response, Heinbuch stated "Right.  These projections are supposed to be made before the list expires." (Id.).  Again, and as discussed infra, whether defendants did or did not strictly follow the MOP is not a material dispute of fact; it is not determinative of racial animus.

[8] For the most part, there are no page numbers to cite within ECF No. 56, Ex. A.  The Court has cited page numbers where they exist.

With respect to the captain exam, Dr. Bruno concluded that
examinees 13 and 50 cheated on the test, presumably with at
least one having advance knowledge of the test answers.  (Id.).
They achieved scores of 102 and 103 respectively, and, of the 7
incorrect answers they shared, their answers matched in 6 cases.
(Id.).  Their scores were "far above most other examinees and
are extremely high given their average scores on all previous
tests taken."  (Id.).  Further, the pair had identical scores of
49 out of the total possible score of 103 on a 2005 exam.
(Id.).  The covering OIG report identified examinees 13 and 50
as Stafford and Williams, respectively.  (ECF No. 56, Ex. B,
Def. 3322).

Dr. Bruno also concluded in the OIG report that examinees 5
and 80's scores, while low, were suspiciously equal.  (ECF No.
56, Ex. A).  One hundred of their answers were identical, and of
their 47 shared incorrect answers, 46 were identical.  Dr. Bruno
concluded that one test-taker copied extensively from the other.
(Id.).  The OIG report identified examinees 5 and 80 as
Lieutenant Thomas Lake and Lieutenant Michael Meyers (a
Caucasian), respectively.  (ECF No. 56, Ex. B, Def. 3323).

Turning to the lieutenant exam, Dr. Bruno opined in his
analysis that examinees 119 and 202 probably cheated on the
test, presumably with at least one having advance knowledge of
the test answers.  (ECF No. 56, Ex. A).  Both test takers

16

achieved a score of 95.  (Id.).  Their scores were far above all other examinees and were extremely high given their average scores on all previous tests taken.  (Id.).  The OIG report identified examinees 119 and 202 as Jenkins and Johnson, respectively. (ECF No. 56, Ex. B, Def. 3324).

Notably, Dr. Bruno's statistical analysis did not find that plaintiff Jones cheated on the exam.  (See ECF No. 56, Ex. A). The OIG's conclusion that Jones cheated on the exam appears to be based instead on Jones' possession of a copy of the 2001 exam (for which she had no explanation), her relationship with Williams, and her perceived unwillingness to cooperate with the investigation.  (See ECF No. 56, Ex. A, 94-96).

The OIG report also noted that race was not a factor in Dr. Bruno's statistical analysis, stating that "the only information provided [to Mr. Bruno] were the rankings, SSN and [examinee numbers] which in no way identifies [sic] the race or sex of the Examinee." (Id.).

As stated, the OIG also conducted interviews.  The office interviewed 18 individuals, including the plaintiffs, Michael Meyers, the BCFD supervisors at the time, the members who posted accusations on Local 964's forum, Chief Goodwin, Ms. Gaskins, Pat Mulligan (the HR person responsible for developing the promotional exam questions), several of the test monitors, and others. (ECF No. 56, Ex. A).  Notes of the interviews were made

and included in the OIG report. (Id.). In their interviews, all five plaintiffs denied cheating in any form. (ECF No. 56, Ex. A, 95, 98, 101, 105, 108). By contrast, Michael Meyers admitted in his interview to cheating by copying Lieutenant Lake's answers on the 2007 exam (neither Meyers nor Lake did well on the exam). (Id. at 111).  Moreover, the OIG reported, and the plaintiffs highlighted that Pat Mulligan told investigators that "it was 'very unusual' to have the scores this high for 'black candidates.'" (Id. at 122; ECF No. 56, Ex. B, Def. 3327).

Ultimately, the OIG concluded in an executive summary to the report[9] that plaintiffs somehow obtained and shared a copy of the actual 2001 promotional test (to which other test-takers did not have access) in violation of testing protocols. (ECF No. 65-1, 4).  Some of the 2001 questions were repeated on the 2007 exam. (Id.).  The executive summary noted that "[w]hen questioned as to how [plaintiffs] came by the 2001 exam, their responses were deceptive and indirect." (Id.).  Last, the executive summary concluded that the test was improperly monitored (e.g., a monitor slept on duty during the exam, and failed to regulate test-takers' access to bathrooms), compromising the security of the entire examination.  (ECF No. 65-1, 5).

---

[9] Both parties submitted executive summaries of the OIG report, and the summaries are not identical. (See ECF No. 56, Ex. A; ECF No. 65-1, 3-8).  The parties agreed that the Court can consider both executive summaries.  (ECF No. 72, 1).  Thus, the Court will consider and refer to both.

Following the release of the report, Mayor Dixon instructed both DHR and BCFD to re-administer the exam on March 15, 2008 to those who took the June 2, 2007 exam and were not identified by the OIG for inappropriate conduct. (ECF No. 47-16). Gladys Gaskins issued notice that the re-test was scheduled for March 15, 2008. (ECF No. 47-18).

Chief Goodwin retired on December 31, 2007, and Gregory Ward became acting chief until a new chief could be appointed. (ECF No. 65, 7). Chief Ward disciplined plaintiffs and Meyers on January 31, 2008. Stafford, Williams, and Meyers were demoted from lieutenants to firefighters. (ECF No. 47-17, 6-8; ECF No. 65, Ex. 2). All plaintiffs and Meyers were transferred, reprimanded, given 29 day suspensions without pay, and denied acting out of title approval for one year. (ECF No. 47-17, 2-11; ECF No. 65, Ex. 2).

On January 23, 2008, the two local firefighter unions (Local 964 and Local 734) grieved the re-test, and sought injunctive relief in the Circuit Court for Baltimore City. (ECF No. 47-19). The unions sought to compel arbitration to reinstate the original test results and prohibit the City from administering the re-test. (Id.). The Court ordered the parties to arbitrate the question of whether the City acted within its proper authority by invalidating the 2007 lists and ordering a re-test. (Id. at ¶ d). In the meantime, DHR was to administer a re-test.

19

(Id. at ¶ f). If the City prevailed in arbitration, the results of the re-exam were to be published and promotions to be made from that list.  (Id. at ¶ i).  On the other hand, if the unions prevailed, the re-exam was to be destroyed, and promotions were to be made in accordance with the June 2, 2007 exam.  (Id. at ¶ j).  In either case, the court ordered all promotions to be made retroactive to the date on which the vacancies first occurred. (Id. at ¶ k).

Arbitration between the unions and the City was held on March 26, 2008 before Ira Jaffe, Esq. (ECF No. 56, Ex. I, 2). The unions argued inter alia that the Rules of Civil Service Commission, by which DHR is bound, limited DHR's choice of remedy in this situation to removal of specific, proven wrongdoers from the list—not the discarding of an entire list because of potential wrongdoing by a few examinees. (Id., Ex. I, 5).  The City countered that DHR acted within its authority under the Rules, which afford DHR discretion to fashion additional remedies where, as here, the integrity of an entire test was compromised.  (Id. at 6).

Before the conclusion of arbitration, the parties reached an agreement that the 2007 list would be reinstated with all promotions retroactive to the date plaintiffs and other BCFD employees would have been promoted had the 2007 list been

implemented when posted.  (ECF No. 47-20, 5).  Results of the
2008 exam were to be destroyed.  (Id.).

In the meantime, Chief Ward was replaced by Chief James Clack,
who started work on April 6 or 7, 2008.  (ECF No. 56, Ex. D, 7).
Chief Clack read the OIG's report, and was particularly struck
by Dr. Bruno's disclaimer that the statistical analysis could
not actually *prove* cheating. (Id. at 14-15).  Chief Clack,
apparently unaware of the result of arbitration, sent a letter
to Ms. Gaskins recommending that the 2007 test be reinstated and
the results of the 2008 test destroyed.  (Id. at 21).

Soon afterwards, Gladys Gaskins reinstated the June 2007 list.
(ECF No. 47-22, 3).  By general order of Chief Clack, dated
April 29, 2008, plaintiffs were all promoted retroactively and
given back pay from the date on which they would have been
promoted had the 2007 list gone into effect on July 2, 2007, the
day the exams were certified and released. (Id. at 24).
Plaintiffs were the first promotions made from the 2007 list.
(ECF No. 56, Ex. E).

Plaintiffs' discipline was also reversed.  Chief Clack felt
that the OIG report was an insufficient basis for plaintiffs'
discipline, and dismissed most of the cheating charges against
them. (ECF No. 47-22, 3-4; ECF No. 47-23, 2).  He reduced
punishment for remaining charges to suspension.  (ECF No. 47-23,
2). Plaintiffs successfully grieved those remaining suspensions.

(ECF No. 47-24).   By way of a series of decisions by Labor Commissioner Moore-Carter, dated between March 9, 2009 and April 27, 2009, the suspensions were reversed and plaintiffs were reimbursed for any lost pay. (Id.).   Thus, all discipline against plaintiffs was eventually reversed and plaintiffs were compensated accordingly.[10]

On January 19, 2010, plaintiffs filed suit in this Court against both BCFD and the City of Baltimore.[11] (ECF No. 1).   The complaint alleged that defendants discriminated against plaintiffs in violation of Title VII by, *inter alia*, (1) falsely accusing them of cheating; (2) conducting a "bogus" administrative investigation of the cheating with no proof; (3) suspending them; and (4) failing to promote them and using the accusations, investigations, and suspensions as "pretexts" to pass over their promotions.  (Id. at 3-4, ¶¶ b-d).[12]  Plaintiffs

---

[10] Chief Clack also rescinded Meyers's discipline, except his 29-day suspension, which was later reduced to a 15-day suspension. (ECF NO. 65, 7).  Meyers grieved his suspension, but, unlike plaintiffs, was unsuccessful. (ECF No. 47-25).

[11] Plaintiffs also sued the City, BCFD, Chief Goodwin, Chief Ward and other managers in the Circuit Court for Baltimore City alleging violations of plaintiffs' rights to due process, equal protection and other constitutional rights; civil conspiracy; false light; and interference with property interests. (ECF No. 47, Ex. 3).

[12] Plaintiffs filed charges of discrimination with the EEOC on August 23, 2007. (ECF No. 47-2).  Each plaintiff's charge alleged that (s)he was (1) falsely accused of cheating with no proof to support the allegations, (2) subjected to an

requested compensatory damages in the amount of $300,000 per plaintiff for, *inter alia*, pecuniary loss, emotional distress, and loss of reputation; punitive damages in the amount of $300,000 per plaintiff; costs and attorneys' fees; and any other relief deemed justified.  (Id. at 6).

## III. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The only facts

---

investigation, and (3) denied promotion. (Id.). Further, each charge stated: "I believe I have been discriminated against in violation of Title VII . . . with regard to promotion based on my race, black." (Id.).

On February 17, 2009, the EEOC issued a determination as to each plaintiff's charge. (ECF No. 47-27).  It reiterated plaintiffs' allegations that BCFD "withheld [plaintiffs'] promotion[s] and launched an investigation despite having no evidence to support the accusation," and that BCFD "discriminated against Blacks as a class with regard to promotion." (Id.).  It explained that BCFD's first response to the charges was that it "was not at liberty to respond" until the OIG's investigation was complete.  (Id.).  Once the OIG's investigation was complete and the plaintiffs retroactively promoted, the EEOC requested that BCFD submit a statement of its position on the issues covered in the charge. (Id.).  BCFD never responded.  (Id.).  Thus, the EEOC "determined that there [was] reasonable cause to believe [plaintiffs were] not promoted . . . because of [their] race, Black."  (Id.).

The EEOC forwarded the case to DOJ, which declined to file suit on behalf of plaintiffs, and issued each plaintiff a notice of right to sue.  (ECF No. 47-3).

that are properly considered "material" are those that might affect the outcome of the case under the governing law.  Id. The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); Pulliam Inv. Co. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987).

When considering a motion for summary judgment, the court views all facts and makes all reasonable inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The non-moving party must show that specific, material facts exist to create a genuine, triable issue. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  As defendants correctly noted citing Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985), a non-moving party "cannot create genuine issue of fact through mere speculation or the building of one inference upon another." Also, a plaintiff cannot proceed to trial without "any significant probative evidence tending to support the complaint."  First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89.  On those issues for which the non-moving party will have the burden of proof, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in the rule. Fed. R. Civ. P. 56(c); Mitchell v. Data Gen. Corp., 12 F.3d

1310, 1315-16 (4th Cir. 1993).  Evidence submitted both in support of an in opposition to a motion for summary judgment must be admissible and based on personal knowledge.  Fed. R. Civ. P. 36; Celotex,, 477 U.S. at 323-24; Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. Celotex, 477 U.S. at 322-23.

The role of the Court at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter," but rather to determine whether "there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986).  The issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson at 251-52. A court has an affirmative duty to prevent factually unsupported claims and defenses from proceeding to trial.  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

## IV.  Discussion

Defendants make several arguments in support of their motion for summary judgment and each will be discussed in turn.

### A. BCFD is Not an Entity That Can Be Sued

25

Defendants argue that plaintiffs improperly named BCFD as a defendant, reasoning that BCFD (unlike the City itself) is not an entity that can be sued. (ECF No. 47-1, 14).  For that proposition, defendants cite Upman v. Howard County Police Dep't, No. RDB-09-1547, 2010 WL 1007844, at *2 (D. Md. Mar. 17, 2010) (concluding that only Howard County—not individual government departments—could be sued).  In response, plaintiffs argue that, contrary to defendants' assertion, BCFD can be sued pursuant to the language of Title VII, which permits suits against both employees (such as the City of Baltimore) and agents of employees (such as BCFD).  (Id. at 4).

No dispute of material facts exist as to this issue; it is a legal argument, and, for the following reasons, BCFD is entitled to summary judgment as a matter of law.

The Baltimore City Charter explicitly states that the Mayor and City Council of Baltimore "may sue or be sued."  Balt. City Charter (1996 Ed.), Art. 1, § 1.  The charter also creates the BCFD.  Id., Art. VII, § 47.  Nowhere does the charter permit BCFD to sue or be sued.  Id.  Further, in Upman, this Court determined that only Howard County—not individual government departments—could be sued.  2010 WL 1007844, at *2.  The Court noted that "Maryland law is not unique as federal courts have traditionally recognized that individual government departments lack the capacity to be sued."  Id.; see also Strebeck v.

Baltimore County Police Dept. , 2005 U.S. Dist. LEXIS 26570, 2005 WL 2897932, at *1 (D. Md. Oct. 17, 2005) (holding that neither the Baltimore County Police Department nor the Baltimore County Council can be sued); Adams v. Calvert County Pub. Schs., 201 F. Supp. 2d 516, 520 n.3 (D. Md. 2002) (holding that a school district cannot be sued); James v. Frederick County Pub. Sch., 441 F. Supp. 2d 755, 758 (D. Md. 2006) (finding that the Frederick County Fire Department and public schools cannot be sued); Sow v. Forville Police Department, 636 F.3d 293, 300 (7th Cir. 2011) (affirming grant of summary judgment in favor of police department because department was not a proper party, reasoning that the Indiana statutory scheme does not grant municipal police departments the capacity to sue or be sued).

The Court finds no merit in plaintiffs' argument that BCFD is an agent of the City and agents can be sued under Title VII. See 42 U.S.C. § 2000-e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.") (emphasis added). Plaintiffs contend, incorrectly, that under Title VII, "[t]he only departments and agencies which are exempt as agents are the departments and agencies of the District of Columbia." (ECF No. 56, 4). In fact, 42 U.S.C. § 2000e(b) exempts "the United

States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service" or "a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of the Internal Revenue Code . . . ."  42 U.S.C. § 2000e(b).  More importantly, Plaintiffs overlook the fact that Title VII's exemptions are not the *only* applicable exemptions—other authorities for exemption exist, as made clear by case law cited above.[13]

Accordingly, summary judgment on all claims against BCFD is GRANTED.  Other than changing the named defendants from BCFD and the City to simply the City (of which BCFD is an agency), this decision has no effect on the Court's remaining analysis.[14]

---

[13] Plaintiffs also cite Paroline v. Unisys Corp., 879 F.2d 100 (4th Cir. 1989), vacated in part, 900 F.2d 27 (4th Cir. 1990), for the proposition that BCFD's role as agent of the City of Baltimore subjects it to suit.  In Paroline, a plaintiff sued both her employing company (Unisys) and an employee of that company (Moore) for, *inter alia*, sexual harassment and constructive discharge.  Id. at 102.  The Fourth Circuit determined that Unisys was clearly an "employer" under Title VII, and that the plaintiff had raised genuine issues of material fact as to whether Moore exercised sufficient supervisory authority over the plaintiff to qualify as an agent—and thus as an employer—under § 2000e(b).  Id. at 104.  Paroline is irrelevant to the case at bar—BCFD's qualification as "agent" and/or "employer" is not in question.

[14] The Court will refer to "defendant" rather than "defendants" from this point forward.

**B. Plaintiffs' Claims of Disparate Investigation and Disparate Discipline Are Not Barred as Beyond the Scope of an EEOC Investigation That Could Reasonably Have Been Expected Based on the Charges**

Defendant interprets plaintiffs' complaint as setting forth allegations of three separate forms of disparate treatment—disparate investigation, disparate discipline, and disparate promotion—and contend that the first two forms are improperly before the Court. (Id. at 13). Specifically, defendant posits that plaintiffs failed to exhaust their administrative remedies as to those two forms of discrimination, as they did not include them in their EEOC charges. Plaintiffs' EEOC charges allege disparate promotion alone. (Id. at 14). While plaintiffs' charges deemed the investigation baseless, they did not claim that the investigation itself was conducted in a discriminatory fashion. (Id.). Further, the EEOC charges fail to mention discipline at all. (Id.).

Plaintiffs counter that their claims of disparate investigation and disparate discipline are, in fact, properly before the Court because they were within the scope of the EEOC's investigation that could reasonably have been expected to grow out of the charge of promotion discrimination (Id. at 5 (citing EEOC v. General Electric Co., 532 F.2d 359 (4th Cir. 1976))). Specifically, plaintiffs appear to argue that disparate investigation and discipline were within the scope of

29

the EEOC's investigation because defendant's failure to respond to the EEOC was motivated by its desire not to "disclose to the EEOC that plaintiffs were targeted for investigation and disciplined because of their race, and that their discipline was reversed, all before they were promoted." (Id. at 7).

A Title VII plaintiff is required to exhaust administrative remedies before bringing a claim in federal court. 42 U.S.C. § 2000e-5(e)(1).   The purpose of the exhaustion requirement is to ensure "that the employer is put on notice of the alleged violations so that the matter can be resolved out of court[,] if possible." Miles v. Dell, Inc., 429 F.3d 480, 490 (4th Cir. 2005) (citation omitted). "The EEOC charge defines the scope of the plaintiffs' right to institute a civil suit." See Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000). However, "it does not strictly limit a Title VII suit which may follow; rather, the scope of the civil suit is confined only by the scope of the administrative investigation that can be reasonably expected to follow the charge." Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002) (emphasis added). In other words, "[i]n determining what claims have been administratively exhausted, the litigant is not limited to the 'precise' wording of his formal EEOC charge of discrimination," but may litigate all claims of discrimination that should be uncovered in a reasonable EEOC investigation of that charge.

Talbot v. U.S. Foodservice, Inc., 191 F. Supp. 2d 637, 640 (D.

Md. 2002) (quoting Hubbard v. Rubbermaid, Inc., 436 F. Supp.

1184, 1189 (D. Md. 1977) (emphasis added). Moreover, Courts

liberally construe EEOC charges and have consistently offered

two reasons for doing so. Cooper v. Virginia Beach Fire Dept.,

199 F. Supp. 2d 451, 456-57 (E.D. VA. 2002) (citing Hubbard, 436

F. Supp. at 1188-89 436 F. Supp. at 1188-89). First, complaints

to the EEOC are generally filed by lay persons uninformed of

their specific legal rights and, second, the predominant purpose

of an EEOC filing is to put defendants on notice of potentially

viable claims and to screen out spurious ones. Id.

The claim of disparate promotion in this case stems from the

very same events that animate the claims of disparate

investigation and disparate treatment. All forms of alleged

disparate treatment arise from the accusations of cheating on

the 2007 exam. Indeed, the discipline and promotion decisions

involving the plaintiff were based on the investigation of the

cheating allegations. It is thus reasonable to expect that an

EEOC investigation into the disparate promotion charges would

naturally encompass the investigation and discipline claims.

The actual EEOC investigation that occurred in this case is not

instructive because no substantive investigation was conducted;

defendants' failure to respond limited the investigation and

essentially resulted in a default determination by the EEOC that
there was reasonable cause.

The only Fourth Circuit authority that defendants cite in
support of their argument that plaintiffs' disparate
investigation and discipline claims are barred, <u>Dennis v. County
of Fairfax</u>, 55 F.3d 151 (4th Cir.), is readily distinguishable.[15]
In <u>Dennis</u>, a plaintiff claimed in an EEOC charge that his
employer discriminated against him based on his African American
race by reprimanding him more harshly than a white co-worker for
the same conduct.  <u>Id.</u> at 153.  The plaintiff and the co-worker
had gotten into an argument at the workplace.  <u>Id.</u>  The
plaintiff later brought suit alleging the following, completely
separate employer actions: (1) failure to hire plaintiff the
first few times he applied, and (2) failure to provide the
plaintiff with computer training. <u>Id.</u> at 156.  The plaintiff
also complained about employer action taken *after* the EEOC

---

[15] In addition to <u>Dennis</u>, Defendant cites a decision out of the
Southern District of Ohio - <u>Jackson v. Ohio Bell</u>, 555 F. Supp.
80 (S.D. Ohio 1982).  That case is also readily distinguishable.
There, a plaintiff claimed in his EEOC charge that he was
terminated because he was African American and that, as a
pretext for his termination, plaintiff's employer accused
plaintiff of falsifying time sheets.  <u>Id.</u> at *83.  The Court
concluded that claims that the employer discriminated against
African Americans in general by maintaining "separate lines" of
seniority were beyond scope of EEOC investigation, as well as
claims that plaintiff was harassed and assigned menial duties
because of his race.  <u>Id.</u>  However, those claims, unlike the
claims at bar today, were not bottomed on same exact same
events.

charges were filed: failure to promote the plaintiff in retaliation for his filing of grievances in connection with his reprimand. Id. at 153.  The Court in Dennis concluded that the plaintiffs' subsequent claims of discriminatory hiring, training and promotion were barred as exceeding the scope of the plaintiffs' EEOC charge. Id. at 156.  Unlike those claims, the claims of disparate investigation and disparate discipline in *this* case all stem from the same event and all occurred *before* plaintiffs filed charges with the EEOC.

In light of the liberal construction afforded EEOC complaints, the Court finds as a matter of law that plaintiffs' charge of disparate promotion adequately encompasses disparate investigation and disparate discipline claims. Thus, summary judgment on this basis is DENIED.

   C. **No Genuine Disputes of Material Fact Exist as to the Three Types of Disparate Treatment Alleged: (1) Disparate Investigation, (2) Disparate Discipline, and (3) Disparate Promotion, and Defendant is Entitled to Summary Judgment**

Any discussion of intentional discrimination under Title VII must begin with the standards set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under McDonnell Douglas, plaintiffs have the initial burden of establishing a *prima facie* case of discrimination.  The elements of a *prima facie* case vary depending on the form of discrimination alleged (e.g., disparate hiring, disparate promotion, disparate discipline).  See id. at

802 n.13.   The tests for establishing *prima facie* showings of the relevant forms of discrimination in this case (disparate discipline and promotion) are set forth below.[16]   If plaintiffs make out a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. at 802.   If the employer does so, the burden shifts back to plaintiff to prove that the reason given by the employer was "pretextual" (i.e., a sham to cover discriminatory motive).   Id. at 804.   Summary judgment is proper if a plaintiff has failed to establish a *prima facie* case.   It is also appropriate if the defendant has rebutted a *prima facie* case and the plaintiff has failed to show pretext.

### 1. **Disparate Investigation**

#### a. **Plaintiffs do not have a cognizable, independent claim for discriminatory investigation in this case**

It is unnecessary to analyze whether plaintiffs established a *prima facie* case of disparate investigation because disparate investigation is legally unavailable as an independent claim in this case.

In order to state a cause of action for disparate treatment under Title VII, a plaintiff must allege that (s)he suffered an "adverse employment action." Bristow v. Daily Press, Inc., 770

---

[16] As discussed below, the Court is not aware of any explicit *prima facie* test for disparate investigation.

F.2d 1251, 1255 (4th Cir. 1985). Although "adverse employment actions" can include employment decisions beyond "ultimate employment decisions" such as hiring, granting leave, discharging, promoting, and compensation, the action taken must adversely affect the terms, conditions or benefits of employment. Von Gunten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001); Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc) ("[I]nterlocutory or mediate decisions having no immediate effect upon employment conditions" do not rise to the level of "adverse employment actions.").

Although the Fourth Circuit has not considered whether the initiation of an investigation against an employee can constitute an adverse employment action, several district courts within the Fourth Circuit have. This Court has concluded that "on a proper factual showing, [a claim of disparate investigation] could be sustained." Settle v. Baltimore County, 34 F. Supp. 2d 969, 992 (D. Md. 1999). However, in order to state a claim for disparate investigation that is separate from a concurrently filed disparate treatment claim, the nature and character of the investigation itself must have actually adversely affected some term or condition of employment. See id. ("[T]o support a disparate investigation claim that is sustainable separate and apart from a cognate disparate discipline claims, in the Fourth Circuit, such a claim must

35

satisfy the Page 'adverse action' requirement."); Hoffman v.
Baltimore Police Dept., 379 F. Supp. 2d 778, 792-93 (2005)
(dismissing plaintiffs' disparate investigation where plaintiff
had also brought disparate termination claims, reasoning that in
order "[f]or Defendants' investigation of Plaintiff to give rise
to an independent claim, Plaintiff would need to allege some
employment injury caused by the investigation *independent of his
termination*[,]" which plaintiffs failed to do).  Other courts
within the Fourth Circuit have found that investigations did not
constitute adverse employment action.  See Fulmore v. City of
Greensboro, 2011 U.S. Dist. LEXIS 72970, at *48 (M.D.N.C. July
6, 2011) (rejecting an African American police officer's claim
that his superiors subjected him to disparate criminal
investigations based on his race, holding that "[t]he
investigations did not constitute 'adverse employment actions'
supporting a disparate treatment claim"); Dawson v. Rumsfeld,
No. 1:05-CV-1270, 2006 U.S. Dist. LEXIS 17305, at *19-20 (E.D.
Va. Feb. 8, 2006) (inferring from Fourth Circuit case law that
"the mere decision to initiate an investigation is not an
adverse employment action"); see also Cardenas-Garcia v. Tex.
Tech Univ., 118 Fed. Appx. 793, 794 (5th Cir. 2004)
("[I]nvestigations . . . do not qualify as ultimate employment
actions."); Virostek v. Liberty Twp. Police Department/Trustees,
14 Fed. Appx. 493, 505 (6th Cir. 2001) ("We do not believe that

an investigation alone is sufficient to establish an adverse employment action.").

Accordingly, the Court need not determine whether "disparate investigation" can constitute "adverse employment action" in general.  Rather, the Court concludes, as the <u>Settle</u> and <u>Hoffman</u> courts did, that even if an investigation can amount to a separate "adverse employment action" under certain circumstances, those circumstances do not exist here. Plaintiffs in this case have not alleged that the investigation resulted in some form of employment injury that was independent of injury caused by the alleged disparate promotion or discipline.  The fact that the investigation may have caused embarrassment, anxiety or other emotional distress does not render the investigation an "adverse employment action." <u>See</u> <u>Settle</u>, 34 F. Supp. at 992 ("[N]either inconvenience nor emotional anxiety on the employee's part will constitute an 'employment injury' sufficient to render the investigation itself an adverse employment action independently cognizable under Title VII.").

Thus, summary judgment is GRANTED as to plaintiffs' claims of disparate investigation.

> **b. Even if there were a cognizable, independent claim for discriminatory investigation in this case, defendant would be entitled to summary judgment**

Because the Court has granted summary judgment as to disparate investigation for the reasons above, it need not address the merits of plaintiffs' disparate investigation allegations, but does so because the defendants' allegedly discriminatory denials of plaintiffs' promotions in July, 2007 are inextricably linked factually to the investigation itself.

The Court concludes that even if the claim were available, plaintiffs have failed to establish that the investigation was discriminatory.  While clear tests for establishing *prima facie* disparate promotion and disparate discipline exist, the Court is unaware of any explicit test for establishing a *prima facie* case disparate investigation (in the Fourth Circuit or otherwise). However, the court concludes that plaintiffs have submitted no evidence that could lead a reasonable jury to conclude that defendant's actions in connection with the investigation were discriminatory.

### i. The initial accusations of cheating were (1) not made by defendant, and (2) were not racist in any event

Plaintiffs appear to argue that the initial accusations against them (e.g., the rumors and postings on Local 964's website) were racist. (E.g., ECF No. 56, 21).

However, this argument fails to raise material issues of fact for at least two reasons.  First, and most importantly, the initial suspicion and accusations of cheating (e.g., the rumors

and postings) all of which predate any evidence of an investigation by defendant were initiated by the *firefighters*—not by defendant. (ECF No. 47-5, 4).  Second, while the accusations (particularly the postings from the union website) were offensive, there is no evidence that they were racist.  The postings contained no racial slurs and did not identify the alleged cheaters by name or race. (See ECF No. 47-10).

### ii. No evidence suggests that defendant was motivated by discriminatory intent in ordering the investigation

The record is undisputed that the then Mayor of Baltimore, Sheila Dixon, an African American, ordered the investigation of the cheating allegations regarding the 2007 promotional exams, freezing the list pending the completion of the investigation. While it is undisputed that Chief Goodwin had questions about the integrity of the exam results, it is also undisputed that within days of the release of the exam results both firefighter unions strongly called for an investigation "to protect the integrity of the system."  See supra.

It is also undisputed that a colorblind statistical analysis of all test results substantiated cheating on the exam by four of the five plaintiffs and other aspects of the investigation substantiated improprieties as to the fifth plaintiff and the others.

There is absolutely no direct evidence of racial animus on the part of Chief Goodwin and other decision makers in the decision to order an investigation.  And, there are no reasonable inferences of racial animus that can be drawn from the reported statements of Chief Goodwin, discussed below.

The plaintiffs attempt to create a dispute of fact as to whether the investigation came about because of independent complaints of the unions, or because of a BCFD instigated complaint of the unions, by introduction of the following testimony of Stephen Fugate, a union official regarding a meeting with Robert Malone, a BCFD official and "right hand" to Chief Goodwin, and conversations with Malone and Chief Goodwin on whether the union would "join" the Fire Department's request for an investigation.  (ECF No. 56, 16).

> [T]he day after the list was released and published I had a brief meeting with [Robert Maloney,] the executive officer of the fire department at the time and he explained to me that the department had intended to request an investigation into the allegations of wrongdoing on the promotional examinations and wondered aloud if the unions would join with the chief of the department in requesting that investigation.

(See ECF No. 56, 16; ECF No. 56, Ex. I, 19).

This proffered testimony is unavailing.  First, the defendants objected to this proffered statement on the grounds that it is double hearsay not subject to any exceptions at

either level of hearsay.  (ECF No. 69, 1, 3).  In accordance

with the recently revised Fed. R. Civ. Pro. 56(c)(2), defendants

assert that Fugate's statement "cannot be presented in a form

that would be admissible in evidence." (Id. at 1, 3-4).

Plaintiffs failed to submit a timely response to defendant's

objection.  Thus, the Court will not accept Fugate's statement

for the truth of the matters asserted, that is, that the BCFD

intended to ask for an investigation and solicited the union to

join in the request.[17]

---

[17] Nevertheless, the Court notes that, even if it had been
admissible, the statement would not be a significant material
fact.  Even if it establishes that BCFD wanted an investigation
into the cheating, it does not suggest that that desire was
_discriminatory_.  In fact, portions of the statement that were
left out by plaintiffs show just the opposite.  Fugate made the
following statements immediately after making the statements
highlighted by plaintiffs:

> [Maloney] indicated to me that it was
> believed by [Chief Goodwin,] the chief of
> the department and, you know, the command
> staff that there was indeed some substance
> to the allegation of individuals having
> perhaps cheated . . . [and] there had been
> some, you know, preliminary checking done .
> . . literally visually looking at previous
> promotional lists and his comment was that
> they had done extraordinarily better than
> they had on previous examinations; they kind
> of outdid themselves I believe is the way he
> put it.

(ECF No. 56, Ex. I, 19).  Thus, any suspicion on Chief Goodwin
or BCFD's part was based, at least in part, on a comparison
between plaintiffs' 2007 exam scores and their prior, lower,
exam scores.

Second, the record is replete with the unions' calls for an investigation in this time frame.  There is no indication that at the time of this alleged meeting the unions had decided or not decided to call for an investigation or indeed whether the unions had already called for the investigation.  Unchallenged evidence demonstrates that the union leaders were questioning the exam results and calling for an investigation on behalf of all their membership in a day or two after the announcement of the exam results.  See supra.

In any case, even if Chief Goodwin did play a role in encouraging the unions to call for an investigation into the cheating allegations, there is no evidence whatsoever that the encouragement was based on discriminatory animus.

Plaintiffs identify Chief Goodwin as having racist inclinations (ECF No. 56, 15) and rely on two statements that Goodwin is reported to have made in the course of the OIG report investigation to demonstrate his racial animus.  (ECF No. 56, 9).  For a number of reasons, these statements offer no evidence of discriminatory animus.  The Court sets out below the entire paragraph containing these two statements:

> Chief Goodwin advised that in reviewing the
> statistical data and the recent June 2, 2007 scores,
> that scores of 100 or better are possible but unusual
> because of the difficulty of both tests.  He explained
> that it was more *difficult to understand how the five
> African Americans in question could have scored more
> than 40 points over the "mean" class average.*  He

volunteered that he has been with the Fire Department
for over thirty-three years and he has taken every
examination, working up from recruit to Deputy Chief.
He explained further that the highest score he has
ever received was an 88 and he holds a B.S. Degree
from Maryland and a Masters Degree from Johns Hopkins.
In addition, he explained that *the scores the five
African Americans received are some of the highest
ever recorded in the seven years of noting scores.*

(Italicized text are the statements that plaintiffs
identify as racist).

Plaintiffs assert that Chief Goodwin "candidly admitted
that he was suspicious of the test scores of the plaintiffs
because they were black and because [their scores] were high."
(ECF No. 56, 16).  The only evidence that plaintiffs offer to
support this "candid adm[ission]" is the above OIG's recounting
of Chief Goodwin's interview with its investigator.  The report
states that Goodwin indicated that "the scores of the five
African Americans received are some of the highest ever received
in the seven years of noting scores" and that it was "difficult
to understand how the five African Americans in question could
have scored more than 40 points over the 'mean' class average."
(ECF No. 56, 9, 15; Id. Ex. A, 133).  Plaintiffs' use of this
statement as evidence of Goodwin's discriminatory intent is
strained beyond credibility.  The reference to these five
persons as "African Americans" was made by the IG in his report—
not by Chief Goodwin.  (See ECF No. 56, Ex. A, 133).  And, as
discussed below, the IG referred to plaintiffs as the "five

African Americans" in other places throughout the report.   There is no indication by quotation marks or otherwise that this was Chief Goodwin's characterization.   Accordingly, no discriminatory animus can be inferred from the identification of the race of the plaintiffs in this statement.   Substitution of the term "suspect test takers" for "African Americans" in this statement demonstrates that the colorblind facts and statistics (discussed immediately below) were a legitimate – indeed compelling – basis for an investigation of these five persons to ensure integrity of testing for critical public safety positions.

Moreover, putting the race of plaintiffs and the police chief totally aside, the undisputed evidence demonstrates why an investigation was compelled—again, plaintiffs were said to have bragged about acing the exam before the results were posted, plaintiffs appeared to have been linked to each other through personal relationships, and were rumored to have a connection to someone with access to the test, plaintiffs were said to have done better than they had ever done before, and most of the plaintiffs did much better than other examinees. Fellow firefighters were raising accusations, and union leaders were publicly supporting an investigation.   A recitation of

"colorblind" facts demonstrate that an investigation would have been in order under all circumstances.[18]

Plaintiffs also seem to suggest that DHR played a part in encouraging an investigation, by quoting a statement made by Pat Mulligan (the Test Developer) that "she felt there was a problem with the test because the people in question had never scored this high before and it was 'very unusual' to have scores this high for 'black candidates.'" (Id. at 9, 15; ECF No. 56, Ex. A, 122; ECF No. 56, Ex. B, Def. 3327).  The Court appreciates that, depending on the context, the comment might be viewed as discriminatory, even if factually accurate.  However, plaintiffs present no fact to support any role that Ms. Mulligan had in calling for an investigation;  she was the test developer.  The OIG interviewed her to inquire about security of the test creation process.  Whether Ms. Mulligan's observation regarding prior test performance of African Americans was true or not or was discriminatory or not is irrelevant to this suit, as she is not demonstrated to have played any decision-making role in the

---

[18] Plaintiffs note that the third highest scoring person on the Captain's exam (after plaintiffs Williams and Stafford) was William Jasper, also black, who they say was not accused of any wrongdoing, investigated or disciplined.  (ECF No. 56, 21). This fact, of course, supports the lack of racial animus on the part of the City.  Apparently, his circumstances did not raise the same suspicion among his fellow firefighters who posted complaints as did the circumstances of the five plaintiffs. Notably, the colorblind statistical analysis of the OIG report did not identify Mr. Jasper by his exam number as suspected of cheating.

initiation of the investigation, discipline, or promotion actions.  See Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and *[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination.]"*) (emphasis added) (internal quotation marks omitted) (abrogated on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)) (quoting McCarthy v. Kemper Life Ins. Co., 924 F.2d 683, 686 (7th Cir. 1991)).  Thus, the statement fails to generate any inference of discrimination relevant here.

Last, plaintiffs attempt to create a question as to the discriminatory nature of the investigation by arguing that the OIG report itself concluded that the investigation was racially motivated.  More specifically, plaintiffs claim that the OIG report explicitly "states that plaintiffs were targeted for the investigation on the basis of their race because they got high scores." (ECF No. 56, 15).  To support that claim, plaintiffs point to a statement in the cover letter for the report written by Inspector Green which states that "[a]llegations of cheating were primarily directed at five African American firefighters via various websites posted in numerous firehouses," and that "[t]he allegations were primarily based on the high scores that were obtained by all five African Americans;" and the OIG's

summary memorandum statement that "[t]he second allegation is 'racially motivated' as the top five candidates are African American firefighters." (Id. at 9-10).   These three statements are taken out of context and within context are innocuous.   The references to plaintiffs as "African Americans" in the first two statements in this background introduction to the OIG report are not in any way indicative of discriminatory intent.   As discussed earlier, the report itself identifies the race of the five plaintiffs – the website postings did not.   The third statement involving "racially motivated allegations" was part of a "question presented," which the OIG posed at the outset of its memorandum.   (See ECF No. 56, Ex. B, Def. 3321).   The OIG addressed that question later in the memorandum, concluding that "race" could not have been a factor in its investigation, as the only information provided to Dr. Bruno for the purposes of his statistical analysis consisted of plaintiffs' rankings, SSNs and examinee numbers. (Id. at Def. 3325).[19]   Reliance on these

---

[19] In further support of their argument that the cheating investigation was discriminatory, plaintiffs point to two statements made by Agent Stoop (an OIG agent involved in the investigation) during the arbitration hearing.   The first statement, made in response to the question "what were you told about the background of the case when you started your investigation?" is as follows: "We were told because of the press in the paper and everything that this was supposedly a racially motivated issue, that the white officers were complaining that six African Americans scored higher and they felt they cheated." (ECF No. 64, 2).   This statement is clearly not admissible evidence that the investigation was in fact

statements in the report as evidence of discrimination is disingenuous.

The IG does not conclude in any way, shape or form in his report that the investigation was racially motivated.  Quite the contrary, the OIG report largely substantiated the rumors and questions of cheating by plaintiffs after the test results were released, and apparently were accepted as valid and persuasive by Mayor Dixon who thereafter invalidated the 2007 test results and by then Chief Ward who thereafter imposed discipline on the five plaintiffs.  In addition to the results of the statistical study identifying cheating by four of the five plaintiffs, the

---

discriminatory – it merely shows that the question of racial discrimination was raised in the press.  The fact that racial discrimination was raised in the press is apparent based on newspaper articles submitted into evidence.  For example, in the Baltimore Sun article reporting that the unions encouraged an investigation, it was noted that "Henry Burris, the president of the Vulcan Blazers, called concerns 'racially motivated,' a charge that the union officials denied." (ECF No. 47-13).  The Baltimore Sun also reported that Mayor Dixon hoped that cheating suspicions were not racist. (Id.; ECF No. 47-15).  In the second statement made by Agent Stoop that plaintiffs highlight, he states that there are no facts to support that questions from the 2007 exam were improperly disseminated.  (ECF No. 64, 2; Id., Ex. A, 3).  This statement is completely irrelevant. The OIG report found that a copy of the *2001* test—not the actual 2007 test—was improperly disseminated (ECF No. 65-1, 4). Immediately before stating that there was no evidence of dissemination of the 2001 exam, Agent Stoop explained that there was evidence that the 2001 exam was distributed to the five plaintiffs (and no one else).  (ECF No. 64, Ex. A, 3).

IG reported the following conclusions of his investigation to the Mayor:

> [T]he following activity did take place during the examination: (1) substantial information from a previous 2001 test examination was shared by only a few individuals taking the 2007 examinations contrary to testing protocols, numerous questions on the 2001 test were repeated on the 2007 examination to which other test takers did not have access, all examination booklets warn not to remove question sheets from the Examination Room; (2) a Test Monitor hired by DHR slept on duty during the examination and failed to properly regular access by test takers simultaneously utilizing the men's bathroom; (3) various firefighters acknowledged observing some individuals on their cell phones in the bathroom in violation of established test-taking policy; and (4) one test taker acknowledged "glancing at" another firefighter's answer sheet during the test.

(ECF No. 56, Ex. A – November 28, 2007 letter).

In sum, there are abundant facts from which it can be concluded that the investigation was warranted – indeed compelled – under all the circumstances, without regard to the race of the five test-takers.  Rather than race, the cheating allegations appear to have been based on the following race-neutral factors: (1) plaintiffs bragged about having excelled on the exam before the results were even posted (ECF No. 56, Ex. I, 18); (2) all plaintiffs appeared to have been linked to each other through personal relationships, and were rumored to have a connection to someone with access to the test (ECF No. 47-5, 3-4, 6; ECF No. 47-7, 3; ECF No. 47-8, 3-4, 5; 47-10, 2; ECF No.

47-12, 3); (3) plaintiffs were said to have done better than they had ever done before[20] (ECF No. 56, Ex. A & Ex. B, Def. 3322, 3324 (Dr. Bruno's later statistical analysis concluded that Stafford, Williams, Jenkins and Johnson's 2007 scores were "extremely high given their average scores on all previous tests taken"); ECF No. 47-13 (Baltimore Sun article in which Fugate stated that some of the plaintiffs had failed prior exams); ECF No. 65-1, 2 (Pat Mulligan stated in an email that Stafford, Williams and Jones had either scored much lower or failed prior exams); and (4) most of the plaintiffs did much better than other examinees (ECF No. 56, Ex. B. Def. 3322, 3324; ECF No. 47-9, 2-11; ECF No. 47-13; ECF No. 47-14).

### iii. The Mayor's actual demand for an investigation was not discriminatory

Plaintiffs do not appear to argue that the Mayor's actual demand that the OIG conduct an investigation was discriminatory. Nevertheless, the defendant argues that it was not, and the Court agrees.  The evidence indicates that Mayor Dixon's demand was based on the seriousness of the allegations of cheating made by the unions, reported by the Baltimore Sun and credited undoubtedly by Chief Goodwin, as well as the public interest of

---

[20] As discussed in footnote 1, evidence as to plaintiffs prior scores is incomplete, but there appears to be no dispute that some or all plaintiffs did much less better on prior exams and further that this was known at the time that the investigation was ordered.

promoting officers to positions of critical public safety according to established, fair procedures.

For the reasons set forth above, "[plaintiffs'] claim of disparate investigations (as a subspecies of disparate discipline) fails as a matter of law, because, even assuming he can establish an adverse employment action, he has failed to establish a factual basis supporting an inference of unlawful discrimination.".  See Settle, 34 F. Supp. 2d at 998.

### 2. Disparate Discipline

In order to establish a *prima facie* case of disparate discipline under Title VII, plaintiffs must show that: (i) they are members of a protected class; (ii) the prohibited conduct in which they engaged was comparable in seriousness to misconduct of employees outside the protected class; and (iii) disciplinary measures enforced against them were more severe than those enforced against other employees. Cook v. CSX Transportation Corp., 988 F.2d 507, 510 (4th Cir. 1993).  Because plaintiffs have failed to establish all three elements, summary judgment as to their disparate discipline claim is GRANTED.

The first element is not disputed.  Turning to the second element, the Court notes that the conduct for which plaintiffs were disciplined—cheating based on the OIG report—was comparable in seriousness to misconduct of employees outside the protected class (i.e., Meyers). It is true that Meyers admitted to

cheating while plaintiffs denied cheating.  But that distinction goes to the *weight of evidence* of cheating set forth in the OIG report—not to the *seriousness of conduct* from BCFD's perspective, which was based on the overall conclusions of the OIG report.  The law recognizes "an understanding both of the need to compare only discipline imposed for like offenses in sorting out claims of disparate discipline under Title VII and of the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." Settle, 34 F. Supp. 2d at 992 (citations omitted).

As for the third element, the parties have stipulated that plaintiffs were not disciplined more harshly than Meyers.  (ECF No. 65, 6).  In fact, it appears the Meyers ultimately faced harsher discipline than plaintiffs, as he was not entirely compensated for his suspension.  Plaintiffs do not offer any other comparators besides Meyers. Thus, plaintiffs have failed to establish a *prima facie* case of disparate discipline.

Additionally, defendant argues under the next step of the *McDonnell Douglas* analysis that "[t]he non-discriminatory reason for imposing discipline on the plaintiffs was because of the conclusions contained in the IG's report, that included, *inter alia*, a recommendation by a statistician that [a] high probability of cheating occurred and a report by agents of the

IG's office that the defendants behaved in an unprofessional and uncooperative manner during the investigation." (ECF No. 65, 9). Because summary judgment is appropriate at the first step of the *McDonnell Douglas* analysis, the Court need not address this argument.  Nevertheless, the Court notes that plaintiffs have not shown that defendant's legitimate, non-discriminatory reason was a mere pretext for disciplining plaintiffs.  The only argument as to pretext that plaintiffs offer is the bald statement that Chief Goodwin was racist. (ECF No. 56, 18, ¶41). In support of that proposition, plaintiffs again misleadingly cite to the OIG's report on Goodwin's interview.  (Id.).[21]

Accordingly, summary judgment as to plaintiffs' disparate discipline claims is GRANTED.

### 3. **Disparate Promotion**

To establish a *prima facie* case of disparate promotion, plaintiffs must show: (i) that they are members of a protected class; (ii) that they applied for promotion; (iii) that they were qualified for the promotion; (iv) that they were denied the promotion; and (v) that the position remained open or was filled

---

[21] Plaintiffs also appear to argue that the fact that the discipline was imposed (by Chief Ward) even after Chief Goodwin retired somehow indicates discriminatory discipline. (ECF No. 56, ¶ 41).  The Court fails to see how that fact indicates discriminatory intent.  If anything, it weakens plaintiffs' case for discrimination because plaintiffs have identified *Goodwin* as the racist, and this fact shows that persons in addition to Goodwin saw merit in the discipline.

by similarly qualified applicants outside the protected class.
Page v. Bolger, 645 F.2d 227, 229-30 (4th Cir. 1981) (citing
McDonnell Douglas, 411 U.S. at 802 & n.13).

The first two elements and the fourth element (at  least to
the extent that plaintiffs were *initially* denied promotion) are
not disputed.  The third element is not readily determinable in
this case because plaintiffs' true qualifications hinge on
whether or not they did in fact cheat.  Indeed, neither party
presents an argument as to the third element.  However, because
the test results were re-instated and plaintiffs were ultimately
promoted, the Court will assume that they were qualified.[22]

Turning to the fifth element, the Court finds first that
the persons promoted in lieu of plaintiffs were "similarly
qualified" for purposes of the *prima facie* test.  The plaintiffs
did not present any evidence on the "similar qualification" of
those promoted from the 2005 lists. Neither did the defendant
present evidence that those promoted from the 2005 lists were
more qualified than the plaintiffs.  Given that the scores of

---

[22] This approach comports with the flexibility expectation
set forth in *McDonell Douglas*.  See 411 U.S. at 802 n.13 ("The
facts necessarily will vary in Title VII cases, and the
specification above of the *prima facie* proof required from
respondent is not necessarily applicable in every respect to
differing factual situations."); Brown v. Runyon, 1998 U.S. App.
LEXIS 3237, at *3 n.2 (4th Cir. 1998) ("[C]ourts should not plow
through Title VII proof schemes in an overly formalistic
manner.").

the two groups were from different tests, obviously one cannot compare scores to determine which person was more or less qualified.  All were eligible for promotion, as they passed the test.  As to whether the positions that plaintiffs might have filled were instead filled by "applicants outside the protected class," the Court finds that to be the case, in at least four of the five cases.

Williams and Stafford were #1 and #2, respectively, on the 2007 captain exam. (ECF No. 47-9, 7).  There is nothing in the record to indicate that if the first captain promotions following the expiration of the 2005 list had been made off of the 2007 captain list, Williams and Stafford would not have been the first two persons promoted.  Defendant does not argue otherwise.  Instead of Stafford and Williams, the following two persons were promoted to captain positions for which plaintiffs were competing: Czawlytko (white) and Melrose (white). (ECF No. 64, Ex. A, 19).  On the 2005 exam, Czawlytko and Melrose were the two persons ranking below Hutson (the last person promoted off of the 2005 list before it expired). (See ECF No. 64, 3; Id. Ex. A, 19).

Jenkins, Johnson and Jones were #1, #2, and #3, respectively, on the 2007 lieutenant exam. (ECF No. 47-9, 2).  There is nothing in the record to indicate that that if the first lieutenant promotions made after the 2005 list expired had

been made off of the 2007 lieutenant list, Jenkins, Johnson and Jones would not have been the first three persons promoted. Again, defendant does not argue otherwise.  Instead of plaintiffs, the following three persons from the expired 2005 list were promoted to lieutenant positions for which Jenkins, Johnson and Jones were competing: Lewis-Ott (black), Dubois (white), and Cate (white). (ECF No. 64, 11; ECF No. 56, G, 3-4).

In sum, two white persons were promoted to captain positions rather than two black plaintiffs, and one black person and two white persons were promoted to lieutenant positions rather than three black plaintiffs.  In sum, the effect of the investigation staying the use of the 2007 list was the July-August, 2007 promotion of four whites and one black to vacant lieutenant and captain positions rather than the promotion of the five black plaintiffs to those positions.  Thus, plaintiffs have established a *prima facie* case of disparate promotion.[23] Accordingly, "the burden shifts to [defendant] to articulate a legitimate, nondiscriminatory reason" for promoting the persons from the 2005 list rather than plaintiffs.  McDonnell Douglas, 411 U.S. at 802.

---

[23] While one of the lieutenant positions was not filled by a person outside the protected class, it is difficult to say whose position it was among the three African-American lieutenant candidate plaintiffs.  Accordingly, for purposes of this motion, the Court shall assume that all three African American lieutenant candidate plaintiffs made out a prima facie case.

Defendant has done so by arguing that "[t]he non-discriminatory reason for initially denying promotion to the defendants in July-August, 2007 was based on the fact that the validity of the exam was being investigated." (ECF No. 65, 9).

If the defendant proffers a non-discriminatory reason for its actions, the presumption of discrimination ends and the plaintiffs must show that the proffered reasons are false and that the plaintiffs were the victims of intentional discrimination.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).  Said another way, the burden shifts back to plaintiffs to show that the reason given by defendant was "pretextual" (i.e., a sham to cover discriminatory motive). McDonnell Douglas, 411 U.S. at 804.

Plaintiffs have failed to uphold their burden in this regard.  During the January 30, 2012 hearing, plaintiffs' counsel argued that Chief Goodwin used the accusations and investigation as a pretext to pass over plaintiffs for promotion, and that his true intent was to promote white persons instead of black persons. (See also ECF No. 56, ¶54 ("Chief Goodwin was a racist, and . . . he manipulated the rules and exercised his influence to impede the promotions of [p]laintiffs because they were black.")). But plaintiffs have not supported that argument with any evidence, despite having been granted several opportunities to do so.

Plaintiffs attempt to generate issues of fact as to pretext by arguing that Chief Goodwin's promotion of persons from the expired 2005 lists was illegal (specifically, in violation of the MOUs with the unions or of the MOP in place at the time). (ECF No. 56, 20, ¶ 50).[24]   "Even if there is evidence that the employer erroneously or even purposely misapplied [a] policy, it is not proof of unlawful discrimination."   Dugan v. Albemarle County School Board, 293 F.3d 716, 722-23 (4th Cir. 2002). "Pretext is a lie or a cover up, not merely a mistake . . . [E]rroneous [ ] or even purposefully misappli[cation] of . . . policy will not suffice to overcome summary judgment."   DAG Petroleum Suppliers, LLC v. BP P.L.C., 2008 WL 193193 *6 (4th Cir. 1/23/08).

Moreover, it is difficult to see what other, fairer method of filling vacancies there would be while the integrity of the 2007 exam results were under review.   This approach seems

---

[24] Presumably in an attempt to create another issue of fact as to pretext, plaintiffs argue that DHR had no authority to invalidate the entire 2007 exam and order a re-test. (ECF No. 56, 20-21, ¶ 51). This issue is also not material.   It is not clear why plaintiffs would argue that DHR lacked authority to invalidate the entire 2007 exam.   That position was taken by the unions during arbitration because the unions considered the decision to freeze the entire test—rather than merely removing plaintiffs from the list—unfair to the *other* 2007 examinees. (ECF No. 56, Ex. I, 5). DHR's other option, which may indeed have been the more appropriate choice, would have been merely removing plaintiffs from the list.   (Id.).   Plaintiffs would have been barred from promotion in either case.

reasonable and not obviously selected to effect discrimination. Use of the expired 2005 list in the interim does not establish pretext, even if it was not specifically authorized by policy. Notably, other than demanding their promotion, the plaintiffs do not suggest the preferred or authorized method of filling vacancies in the absence of an active, certified list.  Also, at best, their promotions were delayed – to allow the completion of an investigation into credible concerns regarding cheating on exams for key public safety employees and then to allow the arbitration of disputes over city authority to reject the 2007 list.  Within 10 months of the July disputed exam, the plaintiffs each received the promotion they sought with pay retroactive to the earliest date – July 2 – that they could have been promoted.  The plaintiffs were the first BCFD employees to be promoted to captain and lieutenant positions from the 2007 list once it was reinstated.  Even assuming *arguendo* that every relevant captain and lieutenant promotion that Chief Goodwin made between July 20, 2007 and August 24, 2007 was illegal (and, as discussed above, the record is not sufficient to make that determination), plaintiffs have proffered no evidence whatsoever that the illegality was motivated by *discriminatory intent*. Thus, the question of whether the promotions were illegal is not determinative in this case. See Dugan v. Albemarle County Sch. Bd., 293 F.3d 716, 722-23 (4th Cir. 2002) ("Even if there is

evidence that the employer erroneously or even purposely misapplied [a] policy, it is not proof of unlawful discrimination. . . . [I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiffs' [adverse employment action].").

Having rejected that the asserted illegality of the interim promotions as evidence of pretext, the Courrt can find no evidence that the promotions off the 2005 list—whether illegal or not—were discriminatory.  Between July 20, 2007 and August 24, 2007, Goodwin promoted a total of three captains and six lieutenants off the 2005 lists.  Again, it is not clear whether all nine of those promotions were to positions for which plaintiffs were competing.  Plaintiff claims that only five of the promotions were to positions for which plaintiffs were competing (Melrose, Czawlytko, Lewis-Ott, Dubois, and Cate). Thus, the Court only considered those five positions in its disparate promotion *prima facie* analysis (more specifically in its analysis of whether the positions that plaintiffs might have filled were instead filled by "applicants outside the protected class"). However, the promotion of all nine captains/lieutenants from the 2005 list is relevant because it refutes plaintiffs' pretext argument that Goodwin's true intent was to promote white persons instead of black persons.  As far as captain positions,

Goodwin promoted the three persons ranking directly under
Christopher Hutson, who was the last person promoted to captain
off of the 2005 captain list before it expired. (See ECF No. 64,
3; Id. Ex. A, 24).  Those three persons were: Harry Melrose
(white, promoted July 20, 2007), Scott Czawlytko (white,
promoted July 20, 2007), and James McCauley (black, promoted
August 24, 2007).  (ECF No. 66, Ex. A, 19; ECF No. 56, Ex. G, 3-
4, 7).  Thus, between July 20, 2007 and August 24, 2007, Goodwin
promoted three captains, one of whom was black.  With regard to
lieutenant positions, Goodwin promoted the five persons ranking
directly under Mitchell Gilbert, who was the last person
promoted to lieutenant off of the 2005 lieutenant list before it
expired.  (See ECF No. 64, 4; Id., Ex. A, 28). Those five
persons were: Hennreitta Lewis-Ott (black, promoted July 20,
2007), Matthew Dubois (white, promoted July 20, 2007), Heather
Cate (white, promoted July 20, 2007), Timothy Rice (black,
promoted on July 20, 2007), and Andrew Franz (white, promoted
August 24, 2007). (ECF No. 66, Ex. A, 11; ECF No. 56, Ex. G, 3,
5, 7).  Goodwin also promoted Ellery Queen, a pump operator who
ranked directly *above* Gilbert, to lieutenant (black, promoted
July 20, 2007).  (ECF No. 66, Ex. A, 11; ECF No. 56, Ex. G, 4).
Thus, between July 20, 2007 and August 24, 2007, Goodwin
promoted six lieutenants, three of whom were black.  In sum,
Goodwin promoted nine captains/lieutenants, four of whom were

black.  Thus, the evidence shows that after the 2005 lists

expired, Chief Goodwin promoted the persons ranking immediately

below (and in Queen's case, above) the last persons promoted off

the 2005 lists while they were active, *regardless of race*. Chief

Goodwin's alleged manipulation of the lists did not result in

promotions of all or even mostly white people.  It resulted in

the plaintiffs not being promoted, but not in blacks not being

promoted.

Further, as discussed above, plaintiffs' bald assertion

that Chief Goodwin was racist is without factual support.  Thus,

plaintiffs' unsupported, subjective assertion that Chief Goodwin

was racist does not generate an issue of fact as to pretext.

See, e.g., Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 134-35

(4th Cir. 2002) ("These  affidavits, however, amount to no more

than subjective beliefs, and such evidence, without more, is

insufficient to create a genuine issue of material fact as to

any discriminatory conduct[.]").

In any case, the record demonstrates that the decision not

to promote plaintiffs, but to promote from the prior lists  was

based on the fact that the 2007 exam results were under

scrutiny.  The investigation was not simply the product of Chief

Goodwin's will, and his concern about the integrity of the

exams.  Rather, the investigation arose because serious

accusations were made by plaintiffs' peers in the department,

and public statements and demands by union leaders.  Notably, multiple persons participated in the actions leading to the investigation (e.g., peers, union leaders, Mayor Dixon, Baltimore's then African-American mayor) and leading to the decision not to promote initially off the lists generated by the challenged test results.  (Gladys Gaskins, African American head of Department of Human Resources, Chief Wade).  The Court agrees with the defendant:  "Chief Goodwin was only one of four actors who had significant authority over the decision to order an investigation of the exam (Mayor Dixon) whether to discipline plaintiffs (Chief William Goodwin and Chief Clack) and whether the 2007 test results should be set aside."  (Head of Human Resources, Gladys Gaskins).  (ECF No. 58, 6).

In sum, the evidence leads to only one rational conclusion: the initial denial of plaintiffs' promotions genuinely stemmed from the fact that the validity of the exam results were under investigation.  No pretext has been established.  As defendants state:  "it is not sensible to believe that Chief Goodwin, Gladys Gaskins and Mayor Dixon conspired to deny an entire round of test takers promotion or to have to retake the 2007 promotional exam merely to discriminate against Plaintiffs." (ECF No. 58, 8).  Promotions from the 2005 list—whether in accordance with required promotion procedures or not—were given in order to fill vacancies that arose during the time the 2007

exam results were under investigation, and resulted in the
promotions of some African Americans.  Based on the facts
presented, even if plaintiffs presented a *prima facie* case of
disparate promotion, they have failed to present sufficient
evidence, either direct or circumstantial, for a reasonable jury
to conclude that defendant's proffered reason for initially
failing to promote plaintiffs was a mere pretext, or that the
defendant's true motive was to promote white persons instead of
black persons.   See, e.g., McNeal v. Montgomery County, 307 Fed.
Appx. 766, 775 (4th Cir. 2009) (concluding, in context of a
disparate promotion case, that even if plaintiff "put forth a
*prima facie* case of discrimination, he has not met his burden of
proving that the employer's proffered nondiscriminatory reason
was pretextual" and explaining that plaintiff presented no
direct or circumstantial evidence for a reasonable jury to
conclude that discrimination was a motivating factor); see also,
Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269,
273 (4th Cir. 2005) (affirming grant of summary judgment in
disparate promotion case where, even assuming that plaintiff
established a *prima facie* case of racial discrimination,
plaintiff failed to "show[] . . . any evidence which suggests
that [the employer's proffered reason for its promotion
decision] was a pretext or from which a jury could infer
pretext"); Diamond v. Colonial Life & Accident Ins. Co., 416

F.3d 310, 319 (4th Cir. 2005) ("[A] prima facie case alone is not sufficient to warrant reversal of the district court's summary judgment ruling because [the employer] has asserted legitimate, nondiscriminatory reasons for not promoting [the plaintiff.]"). Direct evidence is not, of course, required to state a prima facie case or rebut a proffered legitimate nondiscriminatory reason for the adverse employment action, here the delay in promotion. And, of course, no direct evidence was presented here. However, more is required than "mere speculation." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

Thus, summary judgment as to plaintiffs' disparate promotions claims is GRANTED.

### 4. Conclusion

For the reasons above, the Court GRANTS defendants' motion for summary judgment.


Date: 3/30/12 _____                    /s/
                              Susan K. Gauvey
                              United States Magistrate Judge